**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SHERREE SEBAST,**

                        **Plaintiff,**                    **1:09-cv-98**
                                                          **(GLS/RFT)**

            **v.**

**JOHN MAHAN; JAMES CAMPBELL;**
**LEONARD CROUCH;** and **ALBANY**
**COUNTY, NEW YORK,**

                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Office of Keith F. Schockmel              KEITH F. SCHOCKMEL, ESQ.
4 Atrium Drive
Suite 290, Executive Woods
Albany, NY 12205

**FOR THE DEFENDANTS:**
*Defendant John Mahan*
Luibrand Law Firm, PLLC                   KEVIN A. LUIBRAND, ESQ.
950 New Loudon Road
Latham, NY 12110

*Defendants James Campbell and*
*Albany County*
Hiscock, Barclay Law Firm                 MICHAEL J. SMITH, ESQ.
50 Beaver Street, Fifth Floor
Albany, NY 12207-2830

*Defendant Leonard Crouch*

Rehfuss, Liguori Law Firm              STEPHEN J. REHFUSS, ESQ.
40 British American Blvd.
Latham, NY 12110

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Sherree Sebast commenced this action under 42 U.S.C. §

1983 against defendants Albany County and John Mahan, James

Campbell, and Leonard Crouch, employees of Albany County, alleging

negligence and violations of her freedom of speech and due process rights

under the United States and New York State Constitutions.  (*See* Compl.,

Dkt. No. 1.)  Pending are defendants' motions for summary judgment.

(Dkt. Nos. 41, 43, 45.)  For the reasons that follow, the motions are granted

in part and denied in part.

### II. Background

**A.    Factual History**

Plaintiff Sherree Sebast began her employment as a Clerk Typist I

with the Albany County Sheriff's Department in 1999.  (*See* Pl. Resp. SMF

¶ 2, Dkt. No. 50:1.)  As one of three civilian female employees at the office,

2

Sebast performed various administrative functions.  (*See id.* at ¶ 3.)

From October 2003 to Summer 2005, Sebast and defendant John Mahan, Albany County Undersheriff, were involved in a romantic, sexual relationship, during which Mahan allegedly took compromising photographs of Sebast.  (*See id.* at ¶¶ 4-5.)  According to Sebast, following the end of the relationship, Mahan continuously accessed her work computer and her home, work, and cellular telephone voice mails.  (*See id.* at ¶¶ 6-7.)  Mahan allegedly began asking others about Sebast's activities and would wait for Sebast in parking lots at night and drive towards her suddenly, causing her fear.  (*See id.* at ¶¶ 8, 10.)  In the workplace, Mahan became hostile toward Sebast, screaming at her and behaving aggressively.  (*See* Sebast Aff. ¶ 23, Dkt. No. 50.)  Mahan also allegedly made several hang-up phone calls to Sebast's residence, spied on her home, and, on one occasion, knocked on a window and the door of her house at 2:00 a.m.  (*See* Pl. Resp. SMF ¶¶ 9, 11-12, Dkt. No. 50:1.)  Sebast further alleges that her car tires were slashed on two separate occasions.  (*See id.* at ¶ 13.)

In December 2005, Mahan allegedly showed an unlabelled CD to Sebast, telling her that he put the compromising photographs on the CD and was going to mail them to her children and the man she was then

dating.  (*See id.* at ¶ 15.)  In response, Sebast begged him not to do so, to

which Mahan allegedly laughed.  (*See* Sebast Aff. ¶ 28, Dkt. No. 50.)  Later

that day, Sebast found an unlabelled CD on her computer keyboard.  She

asked Inspector Mark DeFrancesco to examine the contents of the CD, but

he was unable to open it.  (*See* Pl. Resp. SMF ¶ 16, Dkt. No. 50:1.)  With

the CD in Sebast's purse, Mahan entered Sebast's office and asked her

where the CD was.  (*See id.* at ¶¶ 17-18.)  Surmising that the CD was in

Sebast's purse, Mahan forcibly took the purse away from Sebast and

removed the CD.  (*See id.* at ¶¶ 18-19.)  In taking the purse, Mahan bent

Sebast's finger back, causing her to suffer an injury that required medical

treatment.  (*See id.* at ¶¶ 20-21.)  According to Sebast, DeFrancesco

witnessed some of this incident.  (*See id.*; *see also* Riley Aff., Dkt. No. 50

(testifying to a conversation with DeFrancesco in which DeFrancesco

described witnessing Mahan scream at and grab Sebast).)

A few days later, on December 19 and 20, after allegedly speaking to

an unnamed coworker about her situation, Sebast met twice with defendant

Sheriff James Campbell.  (*See* Pl. Resp. SMF ¶ 23; *see also* Campbell

Reply SMF ¶ 23, Dkt. No. 51:2.)  While the parties do not dispute that

Mahan was the subject of their meetings, they do dispute the extent of the

4

conversations.  Sebast contends that she told Campbell that Mahan was harassing her and caused her to fear for her safety; had been humiliating and screaming at her at work; had been stalking her by inquiring about her activities, waiting for her in parking lots, making hang-up phone calls, accessing her computer and voice mail, watching her house, and coming to her house; slashed her tires; and had threatened to distribute compromising photographs of her.  (*See* Pl. Resp. SMF ¶ 23, Dkt. No. 50:1.)  However, Campbell contends that Sebast merely told him about her former relationship with Mahan and that Mahan was "was harassing her with name calling and phone hang-ups of that nature."  (Rehfuss Aff., Ex. G, Campbell Dep. at 13-14, Dkt. No. 43:9.)  According to Campbell, Sebast declined his invitation to have the three of them sit down to discuss the matter and instead asked Campbell to talk to Mahan privately.  (*See id.* at 14.)  In a December 20, 2005 memorandum titled "Sherree Sebast Complaint," Campbell detailed his two meetings with Sebast: "[Sebast] advised that [Mahan] has continued to call her on the phone, send e-mails, etc.  She also alleges that he has been harassing her at work, name calling, phone hang-ups, etc.  [She] stated that she wanted [Mahan] to leave her alone and has told him so."  (Campbell Aff., Ex. 6, Dkt. No. 41:7.)

5

Campbell further wrote that Sebast "wanted [him] to meet with [Mahan] and advise him that she requested to be left alone and that would take care of the situation entirely."  (*Id.*)

During the December 20 meeting, Sebast also told Campbell that Mahan injured her finger and that DeFrancesco witnessed the incident. (*See* Pl. Resp. SMF at ¶¶ 23-24, Dkt. No. 50:1.)  But Campbell admittedly never inquired with DeFrancesco about it.  (*See* Rehfuss Aff., Ex. G, Campbell Dep. at 21-21, Dkt. No. 43:9.)

As a result of their meetings, Campbell and Sebast began considering a transfer to another office.  (*See, e.g.*, Campbell Aff., Ex. 8, Feb. 1, 2006 Mem., Dkt. No. 41:10 (detailing January 23, 2006 meeting held by Campbell with Sebast in which, after being "advised that [Sebast] was afraid of [Mahan]," he offered to "look into relocating her to another area"); *id.* (detailing January 31, 2006 meeting in which Sebast stated that she "wanted a transfer" and "would take a transfer to the Cohoes office")).) In response to Sebast's request to be relocated to either the Sheriff's Department office in Voorheesville, New York, or the Albany County Airport office, Campbell informed Sebast that neither office had any clerical openings.  (*See* Campbell SMF ¶ 10, Dkt. No. 41:21.)  Ultimately, after

visiting the office in Cohoes, New York, Sebast consented to a transfer to that office.  (*See* Sebast Aff. ¶ 58, Dkt. No. 50.)  However, on top of her general reluctance to work at the Cohoes office, Sebast contends that she protested any transfer on principle since it was Mahan who created the situation.  (*See id.* at ¶¶ 55, 58.)

On February 6, 2006, Sebast began working at the Cohoes office, with the same salary and same hours, but with different duties.  (*See id.* at ¶ 60; Campbell SMF ¶ 16, Dkt. No. 41:21.)  As the Staff Sergeant at the Cohoes office, defendant Leonard Crouch became Sebast's direct supervisor.  (*See* Rehfuss Aff., Ex. F, Crouch Dep. at 6, 13, Dkt. No. 43:8.)  Prior to the transfer, Crouch and Mahan had discussed Sebast, though the nature of their discussions is in dispute.  (*Compare* Pl. Resp. SMF ¶¶ 34-36, Dkt. No. 50:1, *with* Crouch Reply SMF ¶¶ 34-36, Dkt. No. 52:2.)  During the first few months that Sebast was at the Cohoes office, she and Crouch developed a collegial relationship, pursuant to which Sebast told Crouch about Mahan's actions and Crouch advised Sebast to seek legal counsel. (*See* Sebast Aff. ¶¶ 61-67, Dkt. No. 50.)

However, Sebast grew dissatisfied with the quality of her new assignments and her relationship with Crouch deteriorated.  (*See* Pl. Resp.

SMF ¶¶ 39, 44-45, Dkt. No. 50:1.)  According to Sebast, Crouch became

hostile and aggressive towards her, yelling at and humiliating her, criticizing

her performance, and making fun of her appearance.  (*See id.* at ¶¶ 44-46.)

And Sebast alleges that Crouch was acting on Mahan's request, (*see id. at*

¶ 38), an allegation that is supported by the affidavit of William Riley, a

Captain in the Sheriff's Department, who averred that Crouch revealed in

April 2008 that he was directed by Mahan to make Sebast's life "a living

hell," (*see* Riley Aff. ¶ 7, Dkt. No. 50).

Although Sebast did not file any formal complaints, she does allege

having subsequent telephone conversations with both Sheriff Campbell

and Chief Craig Apple regarding Crouch's behavior.  (*See* Sebast Aff. ¶ 76,

Dkt. No 50.)

## B.   Procedural History

On January 28, 2009, Sebast filed suit against defendants Albany

County, Mahan, Campbell, and Crouch, generally asserting six causes of

action arising under federal and state law: (1) deprivation of her property

without due process by demoting her and cutting her pay; (2) violation of

her equal protection rights; (3) violation of her freedom of speech and

retaliation; (4) conspiracy; (5) deprivation of her property without due

process by transferring her, mistreating her, assigning less desirable duties to her, and refusing to respond to her complaints; and (6) negligence. (*See* Compl. ¶¶ 35-46, Dkt. No. 1.) On July 28, 2009, the court dismissed Sebast's equal protection and conspiracy claims. (*See* July 28, 2009 Decision & Order, Dkt. No. 29.) On April 15, 2010, defendants moved for summary judgment on Sebast's remaining claims. (*See* Dkt. Nos. 41, 43, 45.) In response, Sebast agreed to withdraw her property deprivation claim insofar as it concerned her wage reduction and work-week extension. (*See* Schockmel Aff. ¶¶ 3-4, Dkt. No. 50.) Having interpreted this vague concession to encompass Sebast's first cause of action—which itself is remarkably vague—it is accordingly dismissed. The court will address defendants' motions as they relate to the remaining third, fifth, and sixth causes of action.

### III. <u>Standard of Review</u>

The standard for the grant of summary judgment is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*, 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

### IV. <u>Discussion</u>

9

## A.    Freedom of Speech & Retaliation

Defendants seek summary judgment on Sebast's unconstitutional retaliation claim, arguing that Sebast neither engaged in protected speech nor suffered an adverse employment decision.  Drawing all reasonable inferences in favor of Sebast as the nonmoving party, the court concludes that genuine issues of material fact remain as to Sebast's retaliation claim.

A First Amendment retaliation claim requires a plaintiff to demonstrate that "(1) [her] speech was constitutionally protected, (2) [she] suffered an adverse employment decision, and (3) a causal connection exists between [her] speech and the adverse employment determination, so that it can be said that [her] speech was a motivating factor in the determination." *Morris v. Landau*, 196 F.3d 102, 110 (2d Cir. 1999).

First, to engage in constitutionally protected speech, the plaintiff must have spoken as a citizen on "on a matter of ... political, social, or other concern to the community." *Id.* (internal quotation marks and citations omitted).  "[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983); *see also Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979) (holding

that First Amendment protects public employee's right to communicate privately or publicly with his employer). "Government employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674 (1994). However, "a statement by a government employee complaining about nothing beyond treatment under personnel rules," *Garcetti v. Ceballos*, 547 U.S. 410, 428 (2006), or "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of [her] employment," *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999), does not implicate the First Amendment. Ultimately, "[w]hether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Id.* at 163 (citation omitted). While motive is not dispositive in deciding whether the speech addresses a matter of public concern, the court should consider "whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009) ("[I]t does not follow that a person *motivated* by a personal

11

grievance cannot be speaking on a matter of public concern.").

Second, an adverse employment decision is one that results in "a materially adverse change in the terms and conditions of employment." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (citation omitted). Accordingly, adverse employment actions can include discharge, a reduction in pay, a demotion, a transfer, or a material reduction in duties. *See Morris*, 196 F.3d at 110; *Bernheim v. Litt*, 79 F.3d 318, 324-26 (2d Cir. 1996).

Third, a plaintiff must establish a causal connection that is "sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment [decision]." *Morris*, 196 F.3d at 110 (citation omitted).  Causation can be established either "indirectly by means of circumstantial evidence, for example, by showing that the protected activity was [closely] followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see also Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).  Importantly, summary judgment is not appropriate where "questions regarding an employer's motive predominate in the inquiry

12

regarding how important a role the protected speech played in the adverse

employment decision."  *Morris*, 196 F.3d at 110 (citation omitted).

        Here, Sebast has sufficiently established a claim for unconstitutional

retaliation to survive summary judgment.  While all inferences drawn from

the current record would lead the court to find that Sebast engaged in

protected speech by complaining to Sheriff Campbell about Undersheriff

Mahan's potential misconduct, *see, e.g.*, *Fikes v. City of Daphne*, 79 F.3d

1079, 1084 (11th Cir. 1996) (holding that an officer's report of misconduct

by fellow officer is a matter of public concern), the court is presently unable

to conclude as a matter of law that Sebast's verbal complaints to Campbell

were protected.  In other words, questions of material fact remain regarding

the subject matter and contents of and the purpose behind Sebast's

complaints.  *See, e.g.*, *Wise v. N.Y.C. Police Dep't*, 928 F. Supp. 355, 372

(S.D.N.Y. 1996) (denying summary judgment on First Amendment

retaliation claim where parties disputed the nature of plaintiff's complaint).

        As to the second and third elements of her retaliation claim, a

reasonable jury could find that Sebast suffered an adverse employment

decision and that the decision was causally connected to her complaints.

Sebast has demonstrated that shortly after voicing her complaints to

13

Campbell, she was transferred to a less-desirable office, where she was allegedly assigned trivial, demeaning, and pointless duties, and was subjected to further harassment and misconduct by Crouch, possibly upon Mahan's urging.  Moreover, as it is undisputed that Sebast voiced some complaints to Campbell, Sebast's claim is further reinforced by the dearth of evidence demonstrating that Campbell undertook a meaningful, responsive investigation, provided additional oversight, or made any follow-up inquiries.  Accordingly, the court denies defendants' motion for summary judgment on Sebast's freedom of speech retaliation claim.

**B.    Due Process & Deprivation of Property**

As to Sebast's unlawful deprivation of property claim, defendants argue that she cannot demonstrate that she had a protected property interest or that she suffered a sufficient deprivation of such an interest.[1] Notwithstanding defendants' potentially meritorious arguments, the court finds that Sebast has demonstrated a potentially actionable entitlement. However, her failure to pursue a post-deprivation Article 78 proceeding renders her claim subject to dismissal.

---

[1]In passing, Sebast attempts for the first time to raise a substantive due process claim in her response memorandum of law.  (*See* Pl. Resp. Mem. of Law at 15, Dkt. No. 50:2.)  The court rebuffs such a furtive attempt as unsupported by the pleadings.

"The two threshold questions in any § 1983 claim for denial of procedural due process are whether the plaintiff possessed a liberty or property interest protected by [federal or state law] and, if so, what process was due before the plaintiff could be deprived of that interest." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995) (citations omitted).

The United States Constitution does not create property interests; rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Thus, where a New York State employee is asserting a constitutionally protected interest in her job, the court must "look[] to New York Civil Service Law and the statutes which create a particular position or the authority to appoint or remove an individual to or from the position." *Todaro v. Norat*, 112 F.3d 598, 600 (2d Cir. 1997) (citation omitted).  Where the public employee is not terminated but nonetheless experiences an adverse employment action, "the question is not whether [she] possessed a property interest in employment generally, but whether [she] possessed a property interest in the [particular]

15

position," and whether she "had a legitimate claim of entitlement to it."
*Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) (internal quotation marks and citation omitted).  And while state law determines whether an individual has a property interest, "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause."  *Id.* (internal quotation marks and citation omitted).

Once a plaintiff can establish that the Due Process Clause applies, "the question remains what process is due."  *Id.* at 319 (internal quotation marks and citation omitted).  Generally, "[d]ue process requires only that a hearing be held at a meaningful time and in a meaningful manner."  *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (citation omitted).  "Where a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter."  *Id.* (citations omitted); *see also Hellenic Am. Neighborhood Action Comm. v. City of New York* (*HANAC*), 101 F.3d 877, 880 (2d Cir. 1996) ("When a deprivation occurs because of a random, arbitrary act ... it is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place ... [since] in most cases, it is not only

impracticable, but impossible, to provide a meaningful hearing before the deprivation." (internal quotation marks and citation omitted)).  For example, "[w]hen an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and [since] this cannot be determined in advance," due process will be satisfied if the State provides a meaningful post-resignation hearing.  *Giglio*, 732 F.2d at 1135.  By analogy, where a public employee consents to or is coerced into sacrificing protected conditions of employment, then due process will be satisfied if the employee has access to a meaningful post-deprivation hearing.

Once an employee has been given "a meaningful opportunity to challenge the voluntariness of [her deprivation]," then she cannot claim a due process deprivation "simply because [she] failed to avail [her]self of the opportunity."  *Id.*  "[I]t matters not whether a plaintiff actually avails [her]self of the state court post-deprivation process.  So long as that process is available, a due process claim must be dismissed."  *Longo v. Suffolk County Police Dep't*, 429 F. Supp. 2d 553, 560 (E.D.N.Y. 2006)  (citations omitted).  In other words, "there is *no* constitutional violation (and no available § 1983 action) when there is an adequate state post-deprivation procedure to remedy a random, arbitrary deprivation of property or liberty."

*HANAC*, 101 F.3d at 882 (citations omitted).

In New York State, an Article 78 proceeding provides public employees with an avenue of post-deprivation redress that satisfies due process requirements.  *See Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998); *see also Vargas v. City of New York*, 377 F.3d 200, 208 (2d Cir. 2004) ("[A]n Article 78 proceeding ... provides a meaningful remedy where violations of due process by a local governmental entity are alleged." (citation omitted)); *HANAC*, 101 F.3d at 881 ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." (citation omitted)).  Thus, all public employees "must invoke [A]rticle 78 to review [adverse actions] that are allegedly arbitrary, capricious, or prohibited by statute or the constitution."  *Finley v. Giacobbe*, 79 F.3d 1285, 1292 (2d Cir. 1996); *see also* N.Y. C.P.L.R. § 7803(3) ("[Q]uestions that may be raised in a proceeding under this article [include] ... whether a determination was made in violation of lawful procedure, ... or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed ....").

Upon review of the relevant provisions of the New York State Civil

Service Law, and in light of Sebast's allegations, the court is constrained to find that Sebast's claimed interest may constitute an entitlement subject to due process protections.  New York Civil Service Law provides that no permanent employee may "be removed or otherwise subjected to any disciplinary penalty ... except for incompetency or misconduct shown after a hearing upon stated charges."  N.Y. CIV. SERV. LAW § 75(1).  Here, if Sebast's transfer was actually involuntary—which could be inferred despite the fact that Sebast admittedly consented to a transfer, (*see* Smith Aff., Ex. 4, Sebast Dep. at 25-26, 261, Dkt. No. 41:5 ("I did not want to move to Cohoes ... [but] 'if that's the only thing that can be done to rectify the situation, then I guess I need to move to Cohoes.'")—a factfinder could conclude that the transfer combined with the defendants' alleged misconduct constituted a disciplinary penalty that was exacted upon Sebast without any procedural protections.  And if Sebast's employment was "permanent"—which the parties ardently dispute without providing any definitive evidentiary support—then it is narrowly possible that she had a legitimate claim of entitlement to her pre-transfer position.

Nonetheless, the court finds that because Sebast failed to pursue an Article 78 proceeding—which was both available and more than adequate

19

in light of the interests asserted and the employment actions alleged—she therefore may not maintain a civil action for deprivation of her property without due process.[2]  *See, e.g.*, *Ifill v. N.Y. State Ct. Officers Assoc.*, 655 F. Supp. 2d 382, 390-91 (S.D.N.Y. 2009).  Accordingly, the court grants defendants' motion for summary judgment on Sebast's deprivation of property claim.

## C.   Negligence

In total, Sebast's sixth cause of action reads, "[t]he aforementioned acts of defendants were negligent ... [and a]s a result plaintiff has suffered, and continues to suffer, damages."  (Compl. ¶¶ 45-46, Dkt. No. 1.)  Furthermore, in response to defendants' motion for summary judgment on her negligence claim, Sebast fails to address, or even mention, her negligence claim or the legal or factual basis for it.  (*See* Pl. Resp. Mem. of Law, Dkt. No. 50:2.)  Based on this lack of support for, or even acknowledgment of, her negligence claim, the court may deem it

––––––––––––––––––––

[2]The court rejects Sebast's general, unsupported contention that "it is well settled that ... Sebast, who has suffered a violation of her rights actionable under 42 U.S.C. § 1983 need not exhaust such avenues as an Article 78 or administrative proceedings before filing suit to redress the deprivation."  (Pl. Resp. Mem. of Law at 15, Dkt. No. 50:2.)  To the contrary, it is well settled that an Article 78 proceeding *is the process* available and therefore does not give rise to exhaustion concerns or otherwise "contraven[e] the general rule that exhaustion is not required for § 1983 claims."  *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169 (2d Cir. 2001) (citations omitted); *see also Lawrence v. Antonucci*, 144 Fed. Appx. 193, 194 (2d Cir. 2005); *HANAC*, 101 F.3d at 881.

abandoned.  *See Maher v. Alliance Mortg. Banking Corp.*, No. 06-CV-5073,
2009 WL 2827682, at *13-14 (E.D.N.Y. Sept. 3, 2009) ("Federal courts may
deem a claim abandoned when a party moves for summary judgment on
one ground and the party opposing summary judgment fails to address the
argument in any way.").  Furthermore, upon review of the several
defendants' arguments regarding Sebast's negligence claim, (*see*
Campbell Mem. of Law at 24, Dkt. No. 41:22; Crouch Mem. of Law at 22-
24, Dkt. No. 43:2; Mahan Mem. of Law at 48-49, Dkt. No. 45:1), the court
finds them facially meritorious and therefore grants summary judgment in
favor of defendants on Sebast's negligence cause of action.  *See Road
Dawgs Motorcycle Club of U.S., Inc. v. Cuse Road Dawgs, Inc.*, 679 F.
Supp. 2d 259, 267-68 & n.3 (N.D.N.Y. 2009).

## D.   *Monell* Liability

Defendant Albany County contends that Sebast has failed to
demonstrate a basis for municipal liability.  The court disagrees.

A municipality may be liable under § 1983 only "when execution of a
government's policy or custom, whether made by its lawmakers or by those
whose edicts or acts may fairly be said to represent official policy, inflicts
the injury."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658,

694 (1978).  To establish a municipal policy or custom, a plaintiff must

allege:

> (1) the existence of a formal policy officially endorsed by the
> municipality; (2) actions taken or decisions made by municipal
> officials with final decision making authority, which caused the
> alleged violation of plaintiff's civil rights; (3) a practice so
> persistent and widespread that it constitutes a custom of which
> constructive knowledge can be implied on the part of the
> policymaking officials; or (4) a failure by policymakers to
> properly train or supervise their subordinates, amounting to
> "deliberate indifference" to the rights of those who come in
> contact with the municipal employees.

*Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 174 (S.D.N.Y. 2006)

(citation omitted).  However, a municipality and its supervisory officials may

not be held liable under § 1983 based on the theory of respondeat

superior.  *See Monell*, 436 U.S. 658, 691 (1978).  Moreover, "a single

incident alleged in a complaint, especially if it involved only actors below

the policy-making level, does not suffice to show a municipal policy."

*Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (citations

omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  Still,

a policy may be inferred from circumstantial proof that the municipality

displayed a deliberate indifference to the constitutional rights of an

individual by failing to train its employees or repeatedly failing to make any

meaningful investigation into complaints of constitutional violations after receiving notice. *See Ricciuti*, 941 F.2d at 123.

There is ample evidence on record to support two bases for Albany County's liability on Sebast's retaliation claim. First, from Sebast and Campbell's testimony and Campbell's several internal memoranda, a reasonable jury could find that the acts and omissions of Sheriff Campbell, an official with final decision-making authority, caused or contributed to the freedom of speech violations alleged by Sebast. Second, a jury could reasonably conclude from Mahan and Crouch's alleged actions that Campbell failed to properly train and supervise them, and that his failure to do so amounted to deliberate indifference to Sebast's rights. Therefore, the court denies Albany County's motion insofar as *Monell* liability is concerned. For the same reasons, the court denies Sheriff Campbell's motion as it relates to his individual liability.

## E.    **Qualified Immunity**

"The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d

355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Here, because Sebast's retaliation claim turns on several unresolved questions of fact, including the extent of Mahan and Crouch's behavior, the content of Sebast's complaints, and the states of mind of Campbell, Mahan, and Crouch, the court is unable to conclude as a matter of law that Campbell, Mahan, or Crouch is qualifiedly immune from liability. Accordingly, the court denies defendants' motions on the issue of qualified immunity.

**F.    Statute of Limitations**

Defendant Mahan contends that several incidents at issue are alleged to have occurred outside of the controlling statute of limitations and, as a result, may not serve as predicates for her claims.  The court rejects this contention at this juncture.

Section 1983 actions are governed by the "general or residual state statute of limitations for personal injury actions."  *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (internal quotation marks and citation omitted). As a result, New York's three-year statute of limitations for a personal injury, N.Y.C.P.L.R. § 214(5), applies to § 1983 actions in New York.  *See Ormiston*, 117 F.3d at 71.  However, the accrual date is governed by

24

federal law, which establishes that the statute of limitations begins to run at the "point in time when the plaintiff knows or has reason to know of the injury which is the basis of [her] action." *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) (internal quotation marks and citations omitted). Accordingly, "[t]he crucial time for accrual purposes is when the plaintiff becomes aware that [she] is suffering from a wrong for which damages may be recovered in a civil action." *Id.* at 192. Thus, it is the "wrongful act ... which is actionable." *Id.* Yet, "[w]here no single act is sufficiently decisive to enable a person to realize that [she] has suffered a compensable injury, the cause of action may not accrue until the wrong becomes apparent." *Id.* Furthermore, in limited circumstances, acts falling outside the limitations period can constitute part of a "continuing violation" that "occurs over a series of days or perhaps years." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Glynn v. County of Suffolk*, 50 Fed. Appx. 58, 58-59 (2d Cir. 2002) (directing district court to consider § 1983 claims in light of *Morgan*). And while "discrete discriminatory acts are not actionable if time barred," a plaintiff may rely on prior acts "as background evidence in support of a timely claim." *Id.* at 113. Thus, "evidence of an earlier alleged retaliatory act may constitute relevant

25

background evidence in support of [a] timely claim ... [and] may be considered to assess liability on the timely alleged act." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2d Cir. 2005) (internal quotation marks and citation omitted).

While Mahan attempts to isolate individual acts that may have occurred before January 2006 as time barred, (*see* Mahan Mem. of Law at 20-22, Dkt. No. 45:1), the court is unwilling and unable at this point to disentangle Mahan's alleged pattern of conduct or otherwise separate the alleged conduct into categories of timely acts, untimely acts, and relevant background evidence. Consequently, since the record could support a finding that Mahan's conduct constituted a continuing violation, the court denies Mahan's summary judgment motion insofar as Mahan's statute of limitations defense is concerned.

## V. **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants Albany County, James Campbell, Leonard Crouch, and John Mahan's motions for summary judgment (Dkt. Nos. 41, 43, 45) are **GRANTED** insofar as Sebast's deprivation of property claims (First and Fifth Causes of Action) and negligence claim (Sixth

26

Cause of Action) are **DISMISSED**; and it is further

ORDERED that defendants Albany County, James Campbell,

Leonard Crouch, and John Mahan's motions for summary judgment (Dkt.

Nos. 41, 43, 45) are **DENIED** as to Sebast's freedom of speech and

retaliation claim (Third Cause of Action); and it is further

ORDERED that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

November 16, 2010
Albany, New York

United States District Court Judge